Abraham N. Geller, J.
At the close of the trial the court
rendered an oral decision on the record making findings of fact relating to plaintiff purchaser’s causes of action for the return of his deposit and for damages and defendant seller’s counterclaim for specific performance, and concluding that plaintiff’s causes were dismissed on the merits and that defendant was entitled to a decree of specific performance. The question of adjustments and the effective date thereof was expressly left open, the parties being directed, in the absence of agreement thereon, to submit briefs on the subject “with due regard to the facts in this litigation.” After such submission the court set the matter down for a further hearing, at which additional evidence bearing on the subject of adjustments was received, and in addition, subsequently requested and received a letter from defendant’s attorneys giving undisputed particulars of a fact previously stated in general terms only, which letter has been marked as court’s Exhibit AA.
Superficially it would appear that since the court has found that defendant is entitled to specific performance and that since *682 March 12, 1958 it has been ready, willing and able to convey title to the premises in question to plaintiff, the adjustments should be simply computed as of that date. However, there are equitable considerations arising from the particular facts in this case which impel the court to probe more deeply into the question of the relative equities of the parties in order to serve the ends of justice — the proper function of the court when granting relief by a decree requiring specific performance of a contract.
“ Once the jurisdiction of equity has attached, it will itself proceed to round out the whole circle of the controversy, and decide every other contention connected with the subject matter of the suit essential to do complete justice.” (49 Am. Jur., Specific Performance, § 170, p. 192.) In decreeing specific performance equity requires not only that the contract provisions to be enforced be just and equitable but that the consequences of specific performance likewise be just and equitable and grants relief only on terms that do the other party equity (49 Am. Jur., Specific Performance, pp. 72, 201).
Actually the problem here is divisible into two parts, as suggested by the court in its oral decision. Defendant is entitled to a decree of specific performance of the terms of the contract, but with closing and current adjustments of the items therein enumerated to be effectuated as of the time of the decree in place of the date originally fixed in the contract. The second — and more complex — problem is the assessment of responsibility and damages for the delay in closing from March 12, 1958, when the seller had cleared up the defect, to the date of decree.
The right of the court to grant such additional, incidental or ancillary relief as is necessary to work out the equities of the parties has been uniformly recognized (81 C. J. S., Specific Performance, p. 762). In Powell on Real Property (vol. 6, § 930, p. 341) it is said: “ The equitable elasticity of the procedure for specific performance makes it possible for a court to supplement its basic decree for the completion of the transaction by an assessment and award of damages for the wrongful delay of one of the parties, or by an accounting of the respective losses and gains during the period of litigation ”.
The pertinent facts bearing on the issue of delay found by the court are as follows:
On December 3, 1957, the original date of closing, the seller requested an adjournment in order to verify buyer’s claim of defect with regard to an alteration of two apartments into a single doctor’s office, but insisted that all adjustments should nevertheless be retroactive as of the original closing date. It *683 is conceded that the buyer was willing to grant the adjournment provided adjustments be made as of the date of actual closing and that he stated that he was willing to close then and there if seller gave him a letter undertaking that the obligation to correct the defect, if confirmed, would survive the closing of title. The seller refused to accept either offer and the parties separated with a formal tender by the seller of the deed and a request by the buyer for the return of his deposit. On December 9, 1957 seller’s attorneys wrote to buyer’s attorney that its architect had advised that he would proceed with the necessary measures to procure an amendment of the certificate of occupancy to clear up the objection and that their client was now ready to deliver appropriate undertaking to so amend at its own expense and was prepared to close on December 11, 1957. The response by letter of buyer’s attorney dated December 11 reviewed his client’s offers at the December 3 closing, pointing out that seller had taken the position that any adjournment be subject to retroactive adjustments, and concluded with the statement that thereby seller had repudiated the contract. Buyer then commenced this suit to recover the deposit and damages on December 13, 1957 and seller counterclaimed for specific performance. In the meantime seller, after expending the sum of $2,145.50 to make the necessary changes, obtained an amended certificate and on March 12, 1958 forwarded a copy thereof to buyer’s attorney together with a demand for closing on not less than two days’ notice, which was rejected in view of the “ time ” and “ nature thereof.”
At no time did seller indicate that it had receded from its fixed position that all adjustments should be as of original closing date. Under these circumstances, especially in view of the adamant attitude of seller on December 3 and the tenor of buyer’s letter of December 11, it was incumbent upon seller to make clear that it now agreed that adjustments be computed as of the date of actual closing when it would be enabled to give clear title. That obligation was not satisfied by seller’s vague reference in its March 12 offer to transfer title ‘ ‘ in full, complete and technical compliance with the requirements of the contract.” Indeed, the wording of that phrase might suggest that it was still insisting on retroactive adjustments. There is no question but that seller failed to make a clear, unequivocal commitment as to the date of adjustments being March 12, 1958 — the appropriate equitable date under the authorities for adjustments in a case where a seller has perfected title and made a proper tender, time not being of the essence and no prejudice to buyer having taken place (Pakas v. *684 Clarke, 136 App. Div. 492, affd. 203 N. Y. 534). Further proof of defendant’s equivocal attitude is furnished by its trial memorandum, submitted as late as May, 1959, which urged that it was entitled to specific performance as of December 11, 1957, although in its memorandum accompanying the proposed judgment it now requests a closing date as of March 12, 1958. It is true that the buyer did not make reasonable response to seller’s offer of March 12 and that the court has determined that he is required to specifically perform the contract, but it is also clear that seller’s failure to make an unequivocal offer may have contributed in great measure to the resultant delay. Had it done so, buyer’s refusal to complete the deal at that time would have cast all responsibility for the delay upon him.
Unnecessary procedural litigation delay, produced in large part by a pleading motion made by defendant and an appeal taken by it, merely resulting in an amended pleading being served, caused an action which normally is disposed of within 3 or 4 months to last 18 months.
In the ordinary situation, where there has been a delay in closing title, while rents and profits are being received by the seller in possession, the buyer is retaining the use of the purchase money which is, in effect, the equivalent of interest thereon. The party not at fault has the option to elect, if he be the buyer, whether to pay interest on the purchase money and take the rents and profits or allow the seller to keep the rents and profits and be exempt from the payment of interest (Worrall v. Munn, 53 N. Y. 185); and if he be the seller, whether to take interest on the purchase money and account to the buyer for the rents and profits or keep the rents and profits and make no claim for interest (Scarlata v. Finazzo, 125 N. Y. S. 2d 110; 81 C. J. S., Specific Performance, p. 774).
But, as pointed out in Matter of 50-05 43rd Ave. (Canfield Properties Corp.— Harris) (271 App. Div. 44, 50), “ The rule is subject to some qualifications and exceptions where its application would be inequitable and unjust. ’ ’
About one third of the rent-controlled apartments in this building were vacant. Paradoxically, this was its chief attraction for the buyer, who intended to turn it into a cooperative. The seller no doubt was seeking a substantial price increase in selling to a buyer who was looking for “ co-op ” material. The building was being operated at a loss — hardly surprising in view of the large number of vacancies. None of these vacancies was filled during the entire period of this litigation. In fact, one of the occupied apartments was vacated on December 31, 1958 and was thereafter not rented in accordance with the pro *685 vision in the contract requested by buyer, whereby seller agreed not to rent any apartments which became vacant before date of closing.
The rule cannot be rigidly applied under these circumstances. Since there are no rents and profits but rather losses, a wooden application of the rule would impose on the buyer the hardship of paying interest (approximately $48,000) on the purchase money without any credit for rents and profits. This would be doubly unconscionable because, as has been noted, the seller was also responsible for the long delay (cf. Morrison v. Bauer, 42 Hun 660, opinion in 4 N. Y. St. Rep. 701).
The rule, properly applied, takes into account, in the case of unused property, the rents and profits ‘ ‘ which might have been received by the vendor ” during the period of the delay (Worrall v. Munn, supra, p. 188; see, also, 81 C. J. S., Specific Performance, p. 774). It has been said that where rents and profits are to be considered, this may be on the basis of the actual receipts or the hypothetical rental value (49 Am. Jur., Specific Performance, ann. to p. 198, 1959 cum. supp., p. 25). Here, the only equitable course is to take the rental value of the entire property.
The computations covering the period from March 13, 1958 to June 16, 1959, date of decree, made by the court on the basis of the documentary evidence and the reasonable inferences to be drawn therefrom are as follows:
The actual operating loss was $2,701.31. The rent receivable for the vacant apartments, including the apartment which became vacant subsequently, would be, at ceiling rentals, the sum of $34,835. 20. The additional expenses reasonably required to maintain and operate such apartments during this period and deductible from the gross rental would be management fees of $1,741.76 and maintenance expenses, including repairs, additional essential help, painting and decorating, and supplies, of not less than $3,500. The net rental value of the vacant apartments was therefore $29,593.44. Deducting the actual loss sustained in operating the other apartments, the net income obtainable on the entire building would be $26,892.13.
The court has estimated the amount of reasonable maintenance expenses rather than have a further hearing for expert testimony, since this would result in delay far more costly than the possible difference in such item — one way or the other.
It would be appropriate then, to require the seller, who, by requesting an adjustment date of March 12, 1958, is in effect demanding interest of about $48,000 on the purchase money from that date, to credit buyer with the sum of $26,892.13 or the net income obtainable from the property during the same period, *686 thus imposing a liability of about $21,000 on the buyer for his share of responsibility for the delay.
But, here, the seller could not under its contract with the buyer rent any vacant apartments. This provision was faithfully carried out. It is this requirement of the buyer which induces the court to seek a more equitable measure of damages molded to the peculiar circumstances of this case. “ It has been said, however, that the rule of damages at law does not apply to the computation of damages in a suit for specific performance, that the rule for assessment of damages is not fixed, and that where damages are awarded they should be determined by the application of broad equitable principles ” (81 O. J. S., Specific Performance, § 162, p. 769).
It appears to the court that full justice would be done to the seller in giving it specific performance of the contract terms at this time- — neither party having shown any change during the intervening period in circumstances or market — and awarding it the net rental value of the vacant apartments or the sum of $29,593.44. Seller would then have the benefit of the contract and compensatory damages equal to the net income obtainable from the property, had its use not been limited to suit buyer’s purposes, for the period from time of perfecting title to date of decree. This is a qualified application of the rule, which permits the seller who is granted specific performance to elect to take interest on the purchase money and account for the rents and profits (here, net income obtainable) or keep the rents and profits (here, net income obtainable) and forego the interest. By awarding the larger sum, the court has given effect to seller’s undoubted, even though unexpressed, election between the two alternatives.
Judgment in conformity with the foregoing opinion has been signed and filed.