OPINION OF THE COURT
Beatrice S. Burstein, J.
Liability having been previously determined by order dated November 14, 1983 (Vitale, J.) and affirmed by decision of the Appellate Division dated July 2, 1984 (103 AD2d 1050), the only issue before this court on the Bench trial of this action was the remedy to be awarded plaintiffs, who seek specific performance of a contract for the sale of residential real property and damages.
Based upon the credible testimony and other admitted evidence, and pursuant to CPLR 4213, the court finds and concludes as follows:
Plaintiffs, a young couple who are about to have their first child, resided in a rented apartment. They searched for a home for a considerable period of time, concentrating almost exclusively in three towns located in one area of Long Island, close to both their places of employment and their families and within a school district they considered suitable. On February 5, 1983, some three months after plaintiffs first viewed defendant’s home, and six weeks after defendant first considered selling the property to plaintiffs, they entered into a contract of sale. The parties were represented by counsel of their own choosing, who apparently had assisted in the negotiation of the agreement. Plaintiffs’ original offer of $175,000 later was raised to $185,000. Defendant rejected this too, but then accepted plaintiffs’ offer of $200,000.
*334 The contract of sale, by its first amendment, provides for a payment of the purchase price of $200,000 in three units. Plaintiffs were to pay a deposit of $20,000 to defendant upon signing the contract, which sum was to be held in escrow; they were to pay $120,000 at the closing scheduled for August 1,1983; and defendant was to extend to them a $60,000 purchase-money note and mortgage. The terms of the purchase-money note, as set forth in the “first amendment to contract dated February 5, 1983”, in relevant part were as follows:
“The note shall bear interest at the rate of 12% per annum calculated on a 30 year basis. The principal is due and payable 15 years from the date of making. Purchasers shall have the right to prepay the note without penalty, but partial payments shall be in multiples of $1,000.
“The purchase money note and mortgage shall be drawn on the standard form of New York Board of Title Underwriters by the attorney for Seller. Purchasers shall pay the mortgage recording tax, recording fees and the attorney’s fee of $75.00 for its preparation.”
Plaintiffs deposited the $20,000 at the signing of the contract of sale. The contract was conditioned upon plaintiffs obtaining, within 60 days of February 5, 1983, a mortgage commitment in an amount not less than $100,000 “at the prevailing rate of interest for a term of not less than 30 years.” Plaintiffs received such a commitment from a local private lender within the 60 days.
Plaintiffs advised their landlord they would be vacating their rented residence on August 1,1983. Thereafter, some time in mid-April, defendant advised plaintiffs by telephone that she did not intend to proceed to the closing which had been scheduled for August 1,1983, although her then attorney advised her of her obligation to do so. This was followed by a formal letter dated April 26, 1983 from her counsel to plaintiffs’ counsel, also advising plaintiffs that defendant would not sell the premises.
Defendant, a single parent since 1974, had resided in this home for 15 years, and raised her children there. Her refusal to proceed with the sale was based upon her personal misgivings — she did not want to move, the children *335 and other family members told her she had made a “terrible” mistake and she was displeased with her obligation to give plaintiffs a purchase-money mortgage, which she admittedly had discussed with her counsel before signing the contract. During that precontract period, personal events and household breakdowns had upset defendant. However, there was no testimony to give rise to the slightest inference that she was incapable of contracting or was subject to any legally cognizable duress. She simply did not want to sell.
By letters dated July 14, and July 29, 1983 to defendant’s counsel, plaintiffs’ counsel sought written confirmation as to whether or not defendant would attend the closing scheduled for August 1, 1983. Defendant did not reply. Plaintiffs then proceeded to the closing with their attorney, and representatives from the mortgage and title company. They waited three hours but defendant did not appear.
Plaintiffs then moved from the premises they had rented for $545 per month (which their landlord had let to others) to larger premises which rented at $950 per month. This cost plaintiffs $150 for moving costs and $950 for a broker’s fee. The parties stipulated that plaintiffs’ additional rental costs would be $4,860 per year, although the court notes that at the time of trial a year had not yet expired since plaintiffs moved on August 1, 1983. Plaintiff Paul Bregman testified that he estimates the yearly cost of operating the new home at $26,500 which equals an average of about $2,200 per month.
Plaintiffs incurred other costs as a result of defendant’s failure to proceed with the sale. They spent $175 for a house inspection. They claim they have incurred costs relating to the transfer of title, including $150 to $200 for a survey and disbursements; approximately $150 for a cancellation fee; a 1% origination fee; $3,000 for mortgage points; $1,000 for attorney’s fees; and a filing fee of $40 or $50. Plaintiffs have not been billed for any of these title costs, nor have they had any informal requests for payment since title did not close. However, plaintiff Paul Bregman ‘believes” they are still liable to pay the mortgage points, origination fee and attorney’s fees.
*336 The representative of plaintiffs’ lender testified that if plaintiffs were now to take title the lender would require a new credit update. The total cost of this would be $177 ($150 plus $27). Plaintiffs also claim they have expended or owe $8,823 for attorney’s fees in this action.
Plaintiffs’ expert witness, a broker, testified that the fair market value of the property was $200,000 on February 5, 1983, the date the parties entered the contract of sale; $220,000 on April 26, 1983, the date of defendant’s counsel’s letter advising plaintiffs that defendant would not proceed; $240,000 on August 1, 1983, the date set for closing; and $275,000 on the date of trial.
There was also testimony regarding changing mortgage rates. A representative of plaintiffs’ lender testified at trial that the prevailing rate of interest on the date set for the closing, August 1, 1983, was 12%%, while the prevailing rate at the time of trial was 13%%. The parties stipulated at trial that the total additional interest plaintiffs would have to pay during the course of the 30-year life of a $100,000 mortgage at 13%% interest as opposed to a mortgage at 12%% was $21,139.20.
Defendant’s expert on mortgage rates testified was to average mortgage rates on a nationwide basis, but admitted that rates fluctuate from area to area. While defendant claims her expert’s figures allow the court “to get a feeling for the trend in interest rates”, plaintiffs will be required to get a particular mortgage in this particular area, not participate in a trend. Therefore, defendant’s figures, based on national averages only, are not as exact as those of plaintiffs’ lender’s representative, which were based upon the specific rate a particular lender is actually willing to give plaintiffs. Defendant offered no admissible testimony as to rates being charged by local institutions. Therefore, the court accepts the interest rates offered by plaintiffs, and rounds the total differential off to $21,140.
The court now turns its attention to plaintiffs’ claim that they are entitled to specific performance of the contract. Initially, the court finds plaintiffs were ready, willing and able to purchase the property on the date scheduled for closing, thereby making the remedy of specific performance available to them. (Huntington Min. Holdings v *337 Cottontail Plaza, 96 AD2d 526.) However, it is implicit in Justice Vitale’s order, granting plaintiffs summary judgment on the issue of liability and directing a trial on the issue of plaintiffs’ appropriate remedy, that specific performance could not be determined in this action as a matter of law. Therefore, whether such relief should be granted is within the sound discretion of this court. (Da Silva v Musso, 53 NY2d 543, 547; Hammer v Michael, 243 NY 445, 449; Phalen v United States Trust Co., 186 NY 178, 182.) Nevertheless, that discretion is not unlimited. Therefore, unless the court finds that granting-a decree of specific performance in this action would be a drastic or harsh remedy, or work injustice, the court must direct specific performance. (Da Silva v Musso, 53 NY2d 543, supra.)
Plaintiffs have shown that the house they agreed to purchase was specifically chosen for various valid reasons. Three months elapsed between the time plaintiffs first spoke with defendant and the date they entered into the contract of sale with her. Defendant was fully represented by counsel previously known to her. She has not shown she was subject to undue duress or was in any way fraudulently induced into entering the contract. The claim that others thought her promise to take a purchase-money mortgage was a bad bargain is not a sufficient ground to deny specific performance (see, e.g., Dean v Gregg, 34 Wn App 684), nor is the fact that she is sorry she agreed to sell her home and does not want to move. Therefore, the court finds defendant’s delay and refusal to close was wrongful. Defendant has failed to show that a decree of specific performance would be a drastic or harsh remedy or work any injustice. Therefore, plaintiffs are granted specific performance. As plaintiffs have been awarded specific performance, their claim that they are entitled to be compensated for their loss of the benefit of the bargain in increased value of the property is denied, as moot.
However, plaintiffs are entitled to other sums. The consequences of a decree directing specific performance must be as just and equitable as the decree. (Hirschfeld v Borchard Affiliations, 20 Misc 2d 680.) Therefore, a person awarded specific performance is also entitled to recover as special damages any direct and consequential loss suffered *338 as a result of the seller’s refusal to convey in accordance with the terms of the contract of sale. (Regan v Lanze, 47 AD2d 378, revd on other grounds 40 NY2d 475; Butler v Schilletter, 230 SC 552; see Special or Consequential Damages Recoverable on Account of Delay in Delivering Possession, by Purchaser of Real Property Awarded Specific Performance, Ann., 11 ALR4th 891; see 71 Am Jur 2d, Specific Performance, § 216 et seq.) This includes, insofar as possible, placing the parties in the same position as they would have been had the contract been performed according to its terms. (Worrall v Munn, 38 NY 137; Colonie Motors v Heritage Corp., 61 AD2d 1105, 1107; Specific Performance: Compensation or Damages Awarded Purchaser for Delay in Conveyance of Land, Ann., 7 ALR2d 1201, 1211; see 6A Powell, Real Property, par 925[3].) Mitigation of damages is not an issue. (Ruegsegger v Bangor Twp. Relief Drain, 127 Mich App 28.)
„ Plaintiffs have shown that mortgage rates since the date set for closing to the date of trial increased .75% and therefore over the life of the mortgage they will be required to pay an additional $21,140 in interest. This loss was occasioned solely by defendant. Loss of a favorable mortgage interest rate arising from delay caused by a seller’s breach of the contract of sale is an item of compensable damage. (Regan v Lanze, 47 AD2d 378, revd on other grounds 40 NY2d 475, supra; Julian v Buckley, Mont , 625 P2d 526; Foust v Hanson, 612 SW2d 251 [Tex]; Stratton v Tejani, 139 Cal App 3d 204; Hutton v Gliksberg, 128 Cal App 3d 240; Turley v Ball Assoc., 641 P2d 286 [Col]; Home Amer. v Atkinson, 392 So 2d 268 [Fla]; Godwin v Lindbert, 101 Mich App 754; Reis v Sparks, 547 F2d 236.)
There are varying ways in which these damages have been computed. In Regan v Lanze (47 AD2d 378, revd on. other grounds 40 NY2d 475, supra), the court found plaintiffs were entitled to $3,718.75 for increased mortgage costs. That court did not detail the manner in which it reached that amount. However, simple arithmetic computation indicates that this award represented the total additional interest to be paid over the life of the mortgage.[1] A *339 similar award for the difference in total interest payments was directed in Home Amer. v Atkinson (392 So 2d 268, supra).
At this point equity could apply that principle and award plaintiffs damages in the sum of $21,140. However, the additional sum plaintiffs are going to be required to pay here will be due not in one lump sum, but in portions spread throughout the 30-year life of the mortgage. Spreading these damages out over 12 monthly payments per year for a total of 30 years equals an average payment of only $58.72 per month.[2] Should plaintiffs remain in this home for the next 30 years, some payments will not come due until well into the next century. Therefore, the $21,400 could be invested and produce a far greater return. Furthermore, if plaintiffs sell the house before the next 30 years expires, they will not be making all of these payments. Therefore, to direct payment of $21,140 now would provide plaintiffs with a windfall and be unjust to the defendant by requiring her to pay plaintiffs some money which plaintiffs need not expend for 30 years, or perhaps not at all. In good conscience, equity cannot direct such a resolution.
Other courts confronted with the problem of awarding damages occasioned by changes in mortgage interest rates have approved a calculation of the amount of damages based on the present value of the differential over the whole term of the proposed mortgage. (See, e.g., Hutton v Gliksberg, 128 Cal App 3d 240, supra; Godwin v Lindbert, 101 Mich App 754, supra; Reis v Sparks, 547 F2d 236, supra.) The present value method is based upon a premise that money invested today will earn money in the future, and so when the total amount of damages is not all payable immediately, the amount awarded should take into consideration the earnings potential of that award. (Nelson v State of New York, 105 Misc 2d 107.)
However, this method also has its drawbacks. As stated in Nelson {supra, p 113): “The first problem with this premise is that the earning power of money fluctuates. The second problem is that a party should not be required to *340 wait until the end of a given period of years in order to be compensated for a loss that may be incurred on a periodic basis.” Those difficulties were compounded in this case by a lack of any expert testimony on the manner in which present value should be calculated. Upon what basis was this court to select a discount rate? None of the courts utilizing a present value computation in mortgage cases has set forth the reason for its selection of a discount rate, which varied, e.g., from 5% in Reis v Sparks (547 F2d 236, supra) to 14% in Hutton v Gliksberg (128 Cal App 3d 240, supra).
Over plaintiffs’ objections defendant attempted to introduce into evidence handwritten sheets marked for identification purposes as court’s exhibit I, its admissibility being subject to further consideration by the court. These sheets purport to set forth the present value of plaintiffs’ alleged damages attributable to changes in mortgage rates on the $100,000 and $60,000 loans, and the manner in which defendant arrived at the claimed present value, based upon an annuity. The sheets assume a discount rate of llWfo, allegedly based upon the amount of interest being paid on long-term United States Treasury Bonds, as reported in the New York Times of February 8, 1984 and the Wall Street Journal of February 9,1984. However, there was no testimony as to the validity of using this rate as opposed to any other possible rate. In fact, there was no testimony at all, and plaintiffs obviously could not cross-examine sheets of paper. Therefore, the court finds this exhibit inadmissible.
The court could take judicial notice of a fact relating to United States Government bonds that appears in the Wall Street Journal. (See Bevan v J. H. Constr. Co., 669 P2d 442, 446, n 3 [Utah] [dissenting opn].) However, the court cannot judicially note that the rate of interest being paid upon such bonds is, under these circumstances, the appropriate rate to utilize for discount purposes. Therefore, absent any expert testimony, this court will not consider present value in determining damages. (See Nelson v State of New York, 105 Misc 2d 107, supra.)
However, even if it were to utilize the ll[1]/2% figure there are problems. Giving plaintiffs a judgment for their *341 damages of $21,140 discounted at llx/2% over 30 years, with interest compounded semiannually (as is done with United States Treasury Bonds) would bring plaintiffs’ present award to $738.38. In other words $738.38 invested now at 11V2% compounded semiannually would yield $21,140 in 30 years, if left untouched. However, if they are to be made whole plaintiffs cannot let this money remain invested for 30 years. They must pay the mortgage cost each month, at an average extra payment of $58.72. At that rate, the $738.38 will be depleted very rapidly. Thus, it is clear the application of the present value concept where damages are expressed on a predictable periodic basis would result in real inequity rather than just compensation to the plaintiffs. (See Bevan v J. H. Constr. Co., 669 P2d 442, supra.)
In the Bevan case, the Supreme Court of Utah upheld an award of damages based upon a “sinking fund”. The award envisioned a theoretical annuity designed to produce a monthly income which equalled the difference in interest rates plaintiffs were required to pay monthly on their mortgages because of defendants’ breach. The annuity would be at zero balance at the end of the mortgage term.
If that method were to be applied in this case, utilizing the llx/2% figure, plaintiff would be entitled to the net present value of $58.72 per month for 360 months, compounded semiannually at ll1/2%. This would equal $5,927.55. However, as noted, there is no evidence in this case to support the choice of ll1/2% as a proper rate, or any evidence to aid the court in that regard.
Furthermore, this annuity method was criticized by the dissent in Bevan as creating a potential windfall to plaintiffs. Essentially, the dissent saw three problems: First, that interest rates are likely to fall and plaintiffs will be able to refinance at a lower rate of interest; second, that plaintiffs will sell their home before the mortgage is fully paid; and third, that plaintiffs will be able to invest their award at a far greater rate than the 5x/2% relied upon by the trial court and upheld by the majority. (See Bevan v J. H. Constr. Co., 669 P2d 442, 445, supra [Stewart, J., dissenting].)
*342 Considering the applicability of these arguments to the case at hand, there has been no expert testimony as to whether interest rates will remain constant, or rise or fall, or do all three, over the next 30 years. However, even a glance at any current financial publication will reflect that the “experts” are uncertain as to their course. More importantly, as set forth supra, without proper expert opinion, this court cannot conclude whether the 11V2% interest rate defendant urges the court to employ is a fair yield or not. What is clear is that each method employed by various courts to compensate plaintiffs for changes in mortgage interest rates has serious shortcomings, and results in inequities to either seller or buyer. When courts are faced with such problems, they generally must choose the lesser of the evils.
However, this case has an added factor which makes it different from other cases involving mortgages — that is, defendant’s obligation to give plaintiffs a purchase-money mortgage. Calculating plaintiffs’ damages on that mortgage is fraught with the same problems previously discussed and others. For example, can plaintiffs find a second mortgage when they only intend to invest 20% cash in this property? If so, will it have the same payment terms? Also, the right to prepayment compounds the difficulty of calculating damages (Draper, The Broken Commitment, A Modern View of the Mortgage Lender’s Remedy, 59 Cornell L Rev 418, 429.) However, if this court were to specifically enforce defendant’s obligation to give a purchase-money mortgage, that second mortgage would provide an accurate and direct fund from which to compensate plaintiffs for the additional monthly expenditure of $58.72 they will be required to make on the $100,000 mortgage. In that manner injustice to either party will be ameliorated.
Specifically, the court could direct that the sum of $58.72 be deducted from each of the monthly interest payments due on the purchase-money mortgage. This would continue for the life of the purchase-money mortgage or for so long as plaintiffs remain in the house and remain obligated on the $100,000 mortgage, whichever is shorter. If plaintiffs should move, refinance the property, or cease being obligated on the $100,000 mortgage for some *343 other reason, or when the purchase-money mortgage expires, the deduction would automatically cease. If this method were to be employed, plaintiffs would receive the benefit of almost the exact sum to which they are entitled at the time they are entitled to it, and probably only for a period so long as they are entitled to it. Plaintiffs would not be unjustly enriched by an overly large damage award and defendant would not be unjustly burdened by one.
This would cover the first 15 years of those damages which plaintiffs will suffer because of changing interest rates. The drawback is that it would leave them uncompensated for the last 15 years of the life of the $100,000 mortgage. The court does not find this unjust. Plaintiffs did not present evidence to the court regarding any manner of calculating damages except an outright award. As set forth, supra, under the circumstances of this case, such an award would have constituted an enormous windfall to plaintiffs, which equity cannot condone. Without proper ’ evidence, the court also cannot embark upon a present value analysis. (Nelson v State of New York, 105 Misc 2d 107, supra.)
Another seminal question is whether plaintiffs’ damages will even continue that far into the future. As one court stated, residential real property typically is held for only 7 to 10 years. (Stratton v Tejani, 139 Cal App 3d 204, supra.)
There is also a possibility that interest rates will decline in the future, and plaintiffs will be able to refinance the mortgage at a rate even lower than that originally committed to by plaintiffs’ lender, thereby eradicating further damages. Therefore, the court finds these later damages do not have “the ring of clear predictability” for which defendant should be held responsible. (Regan v Lanze, 47 AD2d 378, 383, revd on other grounds 40 NY2d 475, supra.) Therefore, an award of damages structured in this manner seems eminently fair and just to both parties.
However, the foregoing appears to fly in the face of the traditional rule that a court sitting in equity will not decree specific performance of a simple contract to lend money because there is an adequate remedy at law. (See Bradford, Eldred & Cuba R. R. Co. v New York, Lake Erie & Western R. R. Co., 123 NY 316; see 5A Corbin, Con *344 tracts, § 1152; 1 Pomeroy, Equity Jurisprudence [5th ed], § 221b; Restatement, Contracts, § 343.) This doctrine of an adequate remedy at law finds its basis in the historical English division of chancery and law. As one authority has stated: “Since the chancery courts were established primarily to mitigate the harsh application of common law in the courts, the applicant in chancery had to first demonstrate that his remedy at law was ‘inadequate.’ Because the politically powerful law courts were jealous of their authority, the inadequacy requirement became solidly entrenched as a jurisdictional limitation on the power of the chancellors. Thus, the policy considerations behind the inadequacy rule are largely jurisdictional, based upon the function of the equity courts in English jurisprudence. Although the merger of law and equity has rendered these considerations anachronistic, American courts continue to apply the rule without fully evaluating the continuing validity of its underlying policy considerations.” (Mehr and Kilgore, Enforcement of the Real Estate Loan Commitment: Improvement of the Borrower’s Remedies, 24 Wayne L Rev 1011, 1026-1027; citations omitted.)
Not only have jurisdictional considerations essentially vanished, “the old political bases” have also disappeared. (Groot, Specific Performance of Contracts to Provide Permanent Financing, 60 Cornell L Rev 718, 720.) Even 47 years ago a leading scholar considered the rule that equity will not specifically enforce a lender’s obligation “old and arbitrary”. (Simpson, Fifty Years of American Equity, 50 Harv L Rev 171, 172-173.) Thus, the fusion of law and equity should permit this court to consider more imaginative solutions to the problems which confront it today. Reliance upon precedence for its own sake, without reason, is not required. Rather, where justice demands it, courts have a duty to reexamine questions and, if appropriate, lay to rest outmoded principles no longer adaptable to the rights of individuals in contemporary society. (Ciampichini v Ring Bros., 40 AD2d 289.) Thus, while a long-existing rule requires careful scrutiny upon reexamination, its longevity does not mandate that its effect be given permanence. (Buckley v City of New York, 56 NY2d 300.)
The rule of adequate damages at law has its roots in the nineteenth century English case of Rogers v Challis (27 *345 Beav 175), which involved plaintiff’s promise to lend defendant 1,000 pounds, repayable in four monthly installments, with 10% interest to be paid in advance. Before the loan closed defendant found better terms elsewhere and refused to accept plaintiff’s funds. Plaintiff sued in equity for specific enforcement. His complaint was dismissed upon two grounds.
The first was that if the obligation were upheld, then even a casual oral agreement to lend money could give rise to a cause of action and consequently the courts would be flooded with suits, because the Statute of Frauds does not apply to such a case. However, the mere fact that there will be many persons aggrieved who will seek to enforce their rights is not a valid reason to deny enforcement.
In any event, relating this claim to the case at hand, the obligations surrounding this purchase-money mortgage are set forth in writing as part of the contract of sale. The modern reality is that every aspect of a mortgage agreement generally appears in writing. Furthermore, it is settled law in this State that an agreement to lend money secured by a mortgage on real property is governed by the Statute of Frauds and therefore must be in writing in order to be enforceable. (Sleeth v Sampson, 237 NY 69, 72.)
The second reason set forth in Rogers (supra) was that' the legal remedy available to the plaintiff would be quite adequate. There is no single established test to determine whether and when money damages are adequate or inadequate. Traditionally, if money damages were available, they constituted an adequate remedy ipso facto. Therefore, a court did not have to consider their sufficiency. However, if the term “adequate” takes on its common meaning, then the proper inquiry is whether the borrower will be as fully and completely compensated for his injury by an award of money damages as by specific performance. (Mehr and Kilgore, Enforcement of the Real Estate Loan Commitment: Improvement of the Borrower’s Remedies, 24 Wayne L Rev 1011,1029, citing 5A Corbin, Contracts, § 1142, at p 124.) This áuthority (Mehr) goes on to state that when a borrower has not been able to refinance, courts have shifted their focus from the availability to the sufficiency of damages. This would be in keeping with certain criteria set *346 forth in the Restatement of Contracts which are relevant to this case and the area of mortgage lending. These indicate that when determining the adequacy of a remedy, the court should consider:
“(a) the degree of difficulty and uncertainty in making an accurate valuation of the subject matter involved, in determining the effect of a breach, and in estimating the plaintiff’s harm * * *
“(c) the difficulty, inconvenience, or impossibility of obtaining a duplicate or substantial equivalent of the promised performance by means of money awarded as damages”. (Restatement, Contracts, § 361.)
A review of the facts and analysis set forth, supra, reflects there is considerable difficulty in fairly evaluating the real extent of the plaintiffs’ harm in this case. An accurate calculation of damages in cases concerned with mortgage lending now involves complexities not foreseen 100 years ago. (Draper, The Broken Commitment: A Modern View of the Mortgage Lender’s Remedy, 59 Cornell L Rev 418, 429.) It is not the same as in 1859, when Rogers v Challis (supra, p 179) was decided, and the court could say with equanimity “This is a mere matter of calculation, and a jury would easily assess the amount of the damage which the Plaintiff has sustained.”
The prior analysis also illustrates that a money judgment on the purchase-money mortgage in this case would be substantially unfair to either plaintiff or defendant, depending upon the method of calculation employed, as compared to requiring specific performance of that mort: gage obligation. The problem arises primarily because interest rates in recent years have been subject to unusual fluctuations, and rate trends are not predictable even with reasonable probability. This fact is demonstrated by the varying discount rates employed by courts over even a brief period of years. Compare Reis u Sparks (547 F2d 236, supra), using 5% with Hutton v Gliksberg (128 Cal App 3d 240, supra), applying 14%. These are problems beyond this court’s control.
Thus, in recent years, there has been a noticeable erosion of the rule that a borrower cannot obtain specific performance on an agreement to lend money. Rather, *347 specific performance has been granted, particularly when the loan relates to the sale of real property. (See, e.g., Southampton Wholesale Food Term, v Providence Produce Warehouse Co., 129 F Supp 663; Cuna Mut. Ins. Co. v Dominguez, 9 Ariz App 172; Forman v Benson, 112 Ill App 3d 1070; St. Paul at Chase Corp. v Manufacturers Life Ins. Co., 262 Md 192, cert den 404 US 857; City of Camden v South Jersey Port Comm., 4 NJ 357; Selective Bldrs. v Hudson City Sav. Bank, 137 NJ Super 500; Jacobson v First Nat. Bank, 129 NJ Eq 440, affd 130 NJ Eq 604; Leben v Nassau Sav. & Loan Assn., 40 AD2d 830, affd 34 NY2d 671; Woodruff v Germansky, 233 NY 365; Caplin v Penn Mut. Life Ins. Co., 182 App Div 269, affd 229 NY 545 [right to borrow against a life insurance policy]; National Sur. Corp. v Titan Constr. Co., 26 NYS2d 227, affd 260 App Div 911; Spoolan Realty Corp. v Haebler, 147 Misc 9; Columbus Club v Simons, 110 Okla 48; Vandeventer v Dale Constr. Co., 271 Ore 691, revd and remanded 277 Ore 817; Steward v Bounds, 167 Wash 554; Gideon v Putnam Dev. Co., 113 W Va 200.)
The agreement here is not a simple contract to lend money. It is an integral part of a contract to sell real property. (See Forman v Benson, 112 111 App 3d 1070; see Spoolan Realty Corp. v Haebler, 147 Misc 9, supra.) Defendant knowingly entered into it after discussing the purchase-money mortgage with her attorney. Its terms were tailored by these parties to fit this sale. As one authority has stated, a purchase-money mortgage such as this, given by a seller at lower than commercially available rates, is usually for the purpose of encouraging a sale. It generally indicates that a buyer has agreed either to pay a higher price than he would otherwise have paid, or a price he could not otherwise afford absent the purchase-money mortgage. In return, as here, the buyer has the benefit of relatively lower mortgage payments and a much smaller down payment than could be achieved with more traditional financing. (Ominsky, Creative Mortgaging: PMMS, Wraps and Various Participations, 14 Real Estate Rev 74, 75.)
In recent years, in order to combat the effect of fluctuating interest rates, lenders have begun to offer different *348 types of financing involving other than or more than fixed interest payments, including equity participation, variable interest rates, contingent interest and sale-leasebacks. (See Gunning & Roegge, Contemporary Real Estate Financing Techniques: A Dialogue on Vanishing Simplicity, 3 Real Prop Probate & Trust J 325; Ominsky, Creative Mortgaging: PMMS, Wraps, and Various Participations, 14 Real Estate Rev 34.) Therefore, it is highly unlikely these plaintiffs will find another lender willing to give them a $60,000 second mortgage at 12% with a 15-year term, prepayment rights and a balloon payment. The principal amount, the term, and the prepayment right may all be different, making the substitute performance too costly or otherwise unacceptable. One authority has stated that “specific performance is the only realistic protection available for the borrower’s expectation interest, since only specific performance can protect against all the intangible and immeasurable losses occasioned by a broken commitment.” (Mehr and Kilgore, Enforcement of the Real Estate Loan Commitment: Improvement of the Borrower’s Remedies, 24 Wayne L Rev 1011,1034.) That is true in this case.
There is also the fact that a plaintiff in a case such as this may find himself in a “catch-22” position. To obtain specific performance of the contract to sell, he must prove financial capacity. (Huntington Min. Holdings v Cottontail Plaza, 96 AD2d 526, supra.) However, his financial capacity may depend upon his receiving the specific purchase-money mortgage for which he contracted. If he testifies as to that in order to gain specific performance of the mortgage agreement, his showing of the necessity for the loan may cause him to lose on the issue of specific performance of the contract of sale.
There is one further consideration. One of the reasons defendant disavowed the contract of sale was that she did not want to give a purchase-money mortgage. If the court were not to direct specific performance of this term, defendant will have succeeded in circumventing a clear unequivocal obligation which would otherwise work to plaintiffs’ benefit, and for which accurate damages cannot be awarded. A court should not allow a defaulting lender freedom to accept or reject a contract such as this upon whim. It is a well-known maxim of the law that a person *349 should not be permitted to profit by her own wrong. (Simon v Etgen, 213 NY 589, 600.)
In reevaluating the historical consideration for the rule, whether it has continuing vitality, and considering the manner in which best to compensate plaintiffs without losing sight of defendant’s rights also, the court finds this case to be an occasion where the rule should give way. Accordingly, as specified infra, plaintiffs are granted specific performance of that portion of the contract of sale in which defendant agreed to provide them with a purchase-money mortgage in the amount of $60,000.
Plaintiffs claim they were otherwise injured. In reliance upon the contract of sale plaintiffs advised the landlord they would be moving. He then apparently leased their premises to others and plaintiffs moved into more expensive quarters. They seek compensation for the additional rent they were required to pay.
It is well-settled law that plaintiffs were entitled to seek damages equal to the rental value of the real property at issue upon the condition that they compensate defendant for any loss of use of the purchase money during the delay up to the amount plaintiffs receive for rental value. (Bostwick v Beach, 103 NY 414; Worrall v Munn, 53 NY 185; Regan v Lanze, 47 AD2d 378, 383, revd on other grounds 40 NY2d 475, supra; Eliason v Watts, 615 P2d 427 [Utah]; Ellis v Mihelis, 60 Cal 2d 206; Walker v Benton, 407 So 2d 305 [Fla]; Specific Performance: Compensation or Damages Awarded Purchaser for Delay in Conveyance of Land, Ann., 7 ALR2d 1204,1206.) However, plaintiffs had the right not to seek such compensation. (Worrall v Munn, 53 NY 185, supra; accord Merchants’ Bank v Thomson, 55 NY 7.) Apparently, they elected not to in this case. Nevertheless, plaintiffs are not entitled to recover as damages increased rent due to defendant’s delay. (Baker v Puffer, 299 Ill 486.) In any event, the rent they paid for the new premises, $950 per month, plus the broker’s fee of $950 is probably less than the $2,200 per month it would have cost them to maintain the property at issue, even allowing for tax benefits and growth of equity.
Plaintiffs seek $175 as damages for the cost of having the house inspected. However, they are not entitled to this, as *350 it is an expense they would have incurred in any event, and not attributable to defendant’s delay. Although they may have been entitled to certain benefits from that inspection which may have lapsed, no proof was offered as to what it would now cost to purchase those benefits, nor was the contract setting them forth offered into evidence. Therefore, further relief in this regard is too speculative to award.
Plaintiffs did set forth costs related to closing of title. However, plaintiffs have not actually expended any of these sums, or even been billed for any of them, because title did not close. Therefore, they have not proven they suffered any damages in this regard. There is one exception. Plaintiffs’ lender will now require a credit update, the total cost of which will be $177. Plaintiffs are granted judgment in that amount.
Plaintiffs also are entitled to moving costs caused by the delay (Regan v Lanze, 47 AD2d 378, revd on other grounds 40 NY2d 475, supra), for which plaintiffs claim they spent $150. They are granted judgment in that sum.
Plaintiffs claim legal fees of $7,000 as the cost for prosecuting this action. The contract of sale does not provide for such fees. Plaintiffs have not contended such fees are statutorily authorized (nor are they to the court’s knowledge). Absent either condition counsel fees cannot be awarded. (Matter of Green [Potter], 51 NY2d 627; Regan v Lanze, 47 AD2d 378, revd on other grounds 40 NY2d 475, supra.) Therefore, plaintiffs cannot recover on this claim.
In summation, plaintiffs are granted specific performance of the contract of sale. Defendant is to prepare a bond and mortgage for $60,000 reflecting the terms set forth in the contract of sale, and upon plaintiffs signing the same, and upon their payment of other sums still required by the contract, defendant shall convey to plaintiffs the real property at issue. The judgment to be entered hereon shall specify (1) that plaintiffs shall pay the mortgage recording tax, recording fees, and the $75 attorney’s fee for the preparation, (2) defendant shall have the bond and mortgage available for plaintiffs’ signature within 40 days following the date of entry of the judgment, and (3) closing *351 shall take place on that date, at a time and place agreed upon by the parties.
Plaintiffs’ payments on that purchase-money mortgage shall be reduced by the sum of $58.72 monthly from payments due. The reduction shall continue until the happening of any one of the following events: the end of the term of the purchase-money mortgage; plaintiffs’ sale of the premises or their removal from the premises; or the satisfaction or other termination of plaintiffs’ obligation on the $100,000 mortgage.
Plaintiffs are also granted judgment in the sum of $327 ($177 plus $150).

. In that case the court found that .5% additional interest had to be paid on $29,750. One half of 1% of $29,750 multiplied by the 25-year life of the mortgage equals $3,718.75, the amount of damages awarded.

. This figure was arrived at as follows: 12 months x 30 years equals 360 payments. $21,139.20 divided by 360 = $58.72.